20-3257-cv (L)
*In re: Nine West LBO Sec. Litig.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2021
(Argued:  March 10, 2022      Decided:  November 27, 2023)

Docket Nos. 20-3257-cv (L), 20-3290-cv, 20-3315-cv, 20-3326-cv, 20-3327-cv, 20-3334-cv, 20-3335-cv, 20-3941-cv, 20-3952-cv, 20-3959-cv, 20-3961-cv, 20-3964-cv, 20-3969-cv, 20-3980-cv, 20-3981-cv, 20-3992-cv, 20-3998-cv

---

IN RE: NINE WEST LBO SECURITIES LITIGATION

---

MARC S. KIRSCHNER, AS TRUSTEE FOR THE NWHI LITIGATION TRUST, WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR INDENTURE TRUSTEE FOR THE 6.875% SENIOR NOTES DUE 2019, THE 8.25% SENIOR NOTES DUE 2019, AND THE 6.125% SENIOR NOTES DUE 2034 OF NINE WEST HOLDINGS, INC.,

*Plaintiffs-Appellants*,

ABC,

*Plaintiff*,

*v.*

ROBECO CAPITAL GROWTH FUNDS - ROBECO BP U.S. PREMIUM EQUITIES, FKA BOSTON PARTNERS U.S. PREMIUM EQUITY FUND, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. CORE EQUITY 1 PORTFOLIO, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. CORE EQUITY 2 PORTFOLIO, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. MICRO CAP PORTFOLIO, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. SMALL CAP PORTFOLIO, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. SMALL CAP VALUE PORTFOLIO, DIMENSIONAL FUNDS PLC GLOBAL TARGETED VALUE FUND, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. TARGETED VALUE

PORTFOLIO, AKA NATIONWIDE U.S. TARGETED VALUE STRATEGY, DIMENSIONAL FUNDS PLC U.S. SMALL COMPANIES FUND, AKA IRISH U.S. SMALL CAP FUND, DFA AUSTRALIA LIMITED GLOBAL CORE EQUITY TRUST, AKA DEFENDANT TX-1, DFA INVESTMENT DIMENSIONS GROUP INC. TA U.S. CORE EQUITY 2 PORTFOLIO, AKA DEFENDANT TX-2, DFA INVESTMENT DIMENSIONS GROUP INC. TAX-MANAGED U.S. SMALL CAP PORTFOLIO, AKA DEFENDANT TX-3, DFA INVESTMENT DIMENSIONS GROUP INC. TAX-MANAGED U.S. TARGETED VALUE PORTFOLIO, AKA DEFENDANT TX-4, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. SOCIAL CORE EQUITY 2 PORTFOLIO, AKA DEFENDANT TX-5, DFA INVESTMENT DIMENSIONS GROUP INC. U.S. VECTOR EQUITY PORTFOLIO, AKA DEFENDANT TX-6, DFA INVESTMENT TRUST COMPANY TAX-MANAGED U.S. MARKETWIDE VALUE SERIES, AKA DEFENDANT TX-7, DFA U.S. CORE EQUITY FUND, AKA DEFENDANT TX-8, DFA U.S. VECTOR EQUITY FUND, AKA DEFENDANT TX-9, AMERICAN BEACON SMALL CAP VALUE FUND, AKA DEFENDANT TX-10, HBK MASTER FUND L.P., AKA DEFENDANT TX-11, HBK QUANTITATIVE STRATEGIES MASTER FUND L.P., AKA DEFENDANT TX-12, KENNY ALLAN TROUTT SEPARATE TRUST ESTATE, AKA DEFENDANT TX-13, MICRO CAP SUBTRUST, AKA DEFENDANT TX-14, SMALL CAP VALUE SUBTRUST, AKA DEFENDANT TX-15, TAX-MANAGED U.S. EQUITY SERIES, AKA DEFENDANT TX-16, U.S. SMALL CAP SUBTRUST, AKA DEFENDANT TX-17, USAA EXTENDED MARKET INDEX FUND, VARIABLE ANNUITY LIFE INSURANCE COMPANY I - SMALL CAP INDEX FUND, VARIABLE ANNUITY LIFE INSURANCE COMPANY I - SMALL CAP SPECIAL VALUES FUND, MARY MARGARET HASTINGS GEORGIADES, FLEXSHARES MORNINGSTAR UNITED STATES MARKET FACTOR TILT INDEX FUND, DEFENDANT IL-1, TELENDOS, LLC, HFR ASSET MANAGEMENT, L.L.C., NORTHERN SMALL CAP CORE FUND, NORTHERN SMALL CAP INDEX FUND, NORTHERN SMALL CAP VALUE FUND, NUVEEN SMALL CAP INDEX FUND, PEAK6 INVESTMENTS LLC, FKA PEAK6 INVESTMENTS, L.P., STATE FARM SMALL CAP INDEX FUND, STATE FARM VARIABLE PRODUCTS TRUST, SMALL CAP EQUITY INDEX FUND, VOYA RUSSELL SMALL CAP INDEX PORTFOLIO, CNH MASTER ACCOUNT, L.P., AQR ABSOLUTE RETURN MASTER ACCOUNT, L.P., AQR DELTA MASTER ACCOUNT, L.P., AQR DELTA SAPPHIRE FUND, L.P., AQR DELTA XN MASTER ACCOUNT, L.P., AQR FUNDS - AQR MULTI-STRATEGY ALTERNATIVE FUND, CNH OPPORTUNISTIC PREMIUM OFFSHORE FUND, L.P., AQR FUNDS - AQR DIVERSIFIED ARBITRAGE FUND, SCHWAB CAPITAL TRUST,

2

SCHWAB FUNDAMENTAL U.S. SMALL COMPANY INDEX FUND, SCHWAB SMALL-CAP INDEX FUND, SCHWAB TOTAL STOCK MARKET INDEX FUND, WELLS FARGO DISCIPLINED SMALL CAP FUND, FKA WELLS FARGO SMALL CAP OPPORTUNITIES FUND, DEFENDANT IL-2,

*Defendants-Appellees*,

JOHN T MCCLAIN, GERALD C. CROTTY, TAMI FERSKO, ADVANCED SERIES TRUST ACADEMIC STRATEGIES ALLOCATION PORTFOLIO, ADVANCED SERIES TRUST SMALL CAP VALUE PORTFOLIO, JEFF BRISMAN, MARK DEZAO, CYNTHIA DIPIETRANTONIO, JOHN D'SOUZA, NINIVE GIORDANO, JACK GROSS, ALISON HEMMING, PATRICIA KENNY, IRENE A. KOUMENDOUROS, ARUNDHATI KULKARNI, DEFENDANT NJ-1, DEFENDANT NJ-2, SUZANNE MALONEY, IRA MARGULIES, SUSAN M. MCCOY, VINCENT MORALES, NINE CHAPTERS CAPITAL MANAGEMENT LLC, PAMELA M. PAUL, CHARLES JOSEPH PICKETT, PGIM QMA SMALL-CAP VALUE FUND, DEFENDANT NJ-3, PRUDENTIAL FINANCIAL, INC., THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY CO., QUANTITATIVE MANAGEMENT ASSOCIATES LLC, ARLENE STARR, DEFENDANT NJ-4, ARTHUR E. LEE, NANCY L. LEE, PRIAC FUNDS, CHRISTOPHER R. CADE, IRA M. DANSKY, IRA MARTIN DANSKY REVOCABLE TRUST, MAHMOOD HASSANI-SADI, THOMAS NOLAN, PENTWATER CAPITAL MANAGEMENT LP, RICHARD H. HEIN, TRUSTEE, RICHARD H. HEIN REV. TRUST U/A 06/12/95, CYNTHIA FOY RUPP, TRANSAMERICA ASSET MANAGEMENT, INC., WOLVERINE ASSET MANAGEMENT LLC, WESLEY R CARD, ANN MARIE C WILKINS, ARBOR PLACE LTD. PARTNERSHIP, BOSTON PARTNERS ALL-CAP VALUE FUND, BOSTON PARTNERS ASSET MANAGEMENT, LLC, BOSTON PARTNERS GLOBAL INVESTORS INC., BOSTON PARTNERS, LLC, BRIGHTHOUSE FUNDS TRUST II, FKA BRIGHTHOUSE FUNDS TRUST MET-SERIES, COLUMBIA MANAGEMENT INVESTMENT ADVISERS LLC, COLUMBIA MULTI-MANAGER ALTERNATIVE STRATEGIES FUND, DWS INVESTMENT MANAGEMENT AMERICAS, INC., FKA DEUTSCHE ASSET MANAGEMENT (SCUDDER), DWS SMALL CAP INDEX VIP, GEODE DIVERSIFIED FUND, A SEGREGATED ACCOUNT OF GEODE CAPITAL MASTER FUND LTD. FORMERLY KNOWN AS GDF1, A SEGREGATED ACCOUNT OF GEODE CAPITAL MASTER FUND LTD., JHF II STRATEGIC EQUITY ALLOCATION FUND, JHVIT SMALL CAP INDEX TRUST, FKA JHT SMALL CAP INDEX TRUST, JHVIT SMALL CAP OPPORTUNITIES TRUST, FKA JHT SMALL CAP INDEX TRUST, JHVIT STRATEGIC EQUITY ALLOCATION TRUST, AKA JOHN HANCOCK VARIABLE INSURANCE TRUST SEA SMALL CAP, JOHN HANCOCK II STRATEGIC EQUITY

3

ALLOCATION SMALL CAP FUND, AKA JOHN HANCOCK II SEA SMALL CAP, JOHN HANCOCK U.S. TARGETED VALUE FUND, JOHN HANCOCK U.S. TARGETED VALUE TRUST, LINCOLN INSTITUTE OF LAND POLICY, LONGFELLOW INVESTMENT MANAGEMENT CO., LLC, MANULIFE FINANCIAL, MANULIFE INVESTMENT MANAGEMENT (NORTH AMERICA) LTD., FKA MANULIFE ASSET MANAGEMENT NORTH AMERICA LTD., PANAGORA ASSET MANAGEMENT INC., RHUMBLINE ADVISERS LP, STATE STREET BANK MAYA ACCOUNT HOLDER, STATE STREET GLOBAL ADVISORS, STATE STREET GLOBAL ADVISORS RUSSELL 1000 VALUE FUND CTF, STATE STREET GLOBAL ADVISORS RUSSELL 2000 INDEX FUND, STATE STREET GLOBAL ADVISORS RUSSELL 2000 VALUE FUND CTF, STATE STREET GLOBAL ADVISORS RUSSELL 3000 INDEX FUND CTF, STATE STREET GLOBAL ADVISORS RUSSELL 3000 INDEX FUND, STATE STREET GLOBAL ADVISORS RUSSELL 3000 INDEX FUND SL SER A, STATE STREET GLOBAL ADVISORS RUSSELL SMALL CAP FUND COMPLETE S/L A, STATE STREET GLOBAL ADVISORS RUSSELL SPECIAL SMALL COMPANY FUND, STATE STREET GLOBAL ADVISORS RUSSELL SPECIAL SMALL COMPANY FUND CTF, STATE STREET GLOBAL ADVISORS TOTAL ETF, STATE STREET GLOBAL ADVISORS U.S. EXTENDED MARKET INDEX FUND, AKA U.S. EXTENDED MARKET FUND SL, STATE STREET BANK AND TRUST COMPANY, DIANNE CARD, FIAM LLC, AKA FIDELITY INSTITUTIONAL ASSET MANAGEMENT, FKA PYRAMIS GLOBAL ADVISORS, FIDELITY ASSET ALLOCATION CURRENCY NEUTRAL PRIVATE POOL, FIDELITY ASSET ALLOCATION PRIVATE POOL, FIDELITY BALANCED CURRENCY NEUTRAL PRIVATE POOL, FIDELITY BALANCED INCOME CURRENCY NEUTRAL PRIVATE POOL, FIDELITY BALANCED INCOME PRIVATE POOL, FIDELITY BALANCED PRIVATE POOL, FIDELITY CONCORD STREET TRUST-FIDELITY EXTENDED MARKET INDEX FUND, FIDELITY CONCORD STREET TRUST-FIDELITY TOTAL MARKET INDEX FUND, FIDELITY INCOME ALLOCATION FUND, FKA FIDELITY MONTHLY HIGH INCOME FUND, FIDELITY INVESTMENTS, FIDELITY INVESTMENTS CHARITABLE GIFT FUND, FIDELITY MONTHLY INCOME FUND, FIDELITY NORTHSTAR FUND, FIDELITY SMALL CAP INDEX FUND, FIDELITY TOTAL MARKET INDEX FUND, SPDR S&P MIDCAP 400 ETF TRUST, THE BANK OF NEW YORK MELLON, TRUSTEE, AKA BNY MELLON MIDCAP SPDRS, THE BANK OF NEW YORK MELLON, TRUSTEE, AKA BNY MELLON MIDCAP SPDRS, SIDNEY KIMMEL, THE SIDNEY KIMMEL REVOCABLE INDENTURE OF TRUST, JOHN D. DEMSEY, MATTHEW H. KAMENS, JAMES A. MITAROTONDA, BARINGTON COMPANIES EQUITY PARTNERS, L.P., BARINGTON COMPANIES INVESTORS, LLC, JEFFREY D. NUECHTERLEIN, LOWELL W. ROBINSON, JOSEPH T. DONNALLEY, AIDA TEJERO-DECOLLI, AMERICAN FAMILY MUTUAL INSURANCE CO., AMERICAN INTERNATIONAL

4

GROUP INC., BARBARA KREGER, BLUECREST CAPITAL MANAGEMENT LTD., CALVERT VARIABLE PRODUCTS, INC., (CALVERT VP RUSSELL 2000 SMALL CAP INDEX PORTFOLIO), CHI OPERATING INVESTMENT PROGRAM, LP, CHRYSLER WORLD IMI EQUITY INDEX - ND, CREF EQUITY INDEX ACCOUNT, DANIEL FISHMAN, DONNA F. ZARCONE, DREMAN CONTRARIAN FUNDS, (DREMAN CONTRARIAN SMALL CAP VALUE FUND), EILEEN DUNN, EMERSON ELECTRIC CO., EQ ADVISORS TRUST (ATM SMALL CAP MANAGED VOLATILITY PORTFOLIO), EQ ADVISORS TRUST (EQ/2000 MANAGED VOLATILITY PORTFOLIO), ERIC DAUWALTER, FEDERATED EQUITY FUNDS (FEDERATED CLOVER SMALL VALUE FUND), FRANCES LUKAS, FRANCIS X CLAPS, GABELLI INVESTOR FUNDS INC. (THE GABELLI ABC FUND), GABELLI 787 FUND, INC. (ENTERPRISE MERGERS AND ACQUISITIONS FUND), GEORGE SHARP, GERALD HOOD, GREGG MARKS, GREGORY CLARK, HEATHER HARLAN, HEATHER ROUSSEL, JAMES CAPIOLA, JAMES CHAN, JAMES T. OSTROWSKI, JAMIE CYGIELMAN, JANET CARR, JANICE BROWN, JODI G. WRIGHT, JOSEPH A. ROSATO, JOSEPH STAFINIAK, JPMORGAN SYSTEMATIC ALPHA FUND, KATHERINE BUTLER, KATHLEEN NEDOROSTEK KASWELL, KBC EQUITY FUND - FALLEN ANGELS, KBC EQUITY FUND - LEISURE AND TOURISM, KBC EQUITY FUND - STRATEGIC SATELLITES, LARISSA SYGIDA, LINCOLN VARIABLE INSURANCE PRODUCTS TRUST, (LVIP SSGA SMALL-CAP INDEX FUND), LYNNE BERNSTOCK, MARY E. BELLE, METROPOLITAN LIFE INSURANCE CO, MITCHEL LEVINE, MULTIMANAGER SMALL CAP VALUE PORTFOLIO, NATIONWIDE MUTUAL FUNDS, (NATIONWIDE SMALL CAP INDEX FUND), NATIONWIDE MUTUAL FUNDS, (NATIONWIDE U.S. SMALL CAP VALUE FUND), NATIONWIDE VARIABLE INSURANCE TRUST, (NVIT MULTI-MANAGER SMALL CAP VALUE FUND), NATIXIS SA, NICOLETTA PALMA, NORMAN R. VEIT, JR., ODIN HOLDINGS LP, OPPENHEIMER GLOBAL MULTI STRATEGIES FUND, PINEBRIDGE INVESTMENTS LP, PRINCIPAL FUNDS INC., (SMALLCAP VALUE FUND II), PRINCIPAL VARIABLE CONTRACTS FUNDS INC., (SMALLCAP VALUE ACCOUNT I), PROSHARES TRUST, (PROSHARES MERGER ETF), QUANTITATIVE MASTER SERIES LLC, (MASTER EXTENDED MARKET INDEX SERIES), RBB FUND, INC., (WPG PARTNERS SMALL/MICRO CAP VALUE FUND), ROBYN WHITNEY MILLS, ROSA GENOVESI, ROY CHAN, ROYCE INSTITUTIONAL, LLC, (OPPORTUNITY PORTFOLIO), RUSSELL U.S. SMALL CAP EQUITY FUND, SCOTT BOWMAN, SECURIAN LIFE INSURANCE CO., FKA MINNESOTA LIFE INSURANCE CO., SEI INSTITUTIONAL INVESTMENTS TRUST, (SIIT SMALL CAP FUND), SEI INSTITUTIONAL MANAGED TRUST, (SIMT SMALL CAP VALUE FUND), SHARON HARGER, STEFANI GREENFIELD, STEPHEN C. TROY, STUART WEITZMAN, SUSAN DUFFY, SUSQUEHANNA INTERNATIONAL GROUP LLP, SUZANNE KARKUS, TALCOTT

RESOLUTION LIFE INSURANCE CO., TFS CAPITAL LLC, THE ARBITRAGE EVENT-DRIVEN FUND, THE GDL FUND, TIAA-CREF FUNDS, TIAA-CREF FUNDS (TIAA-CREF EQUITY INDEX FUND), TIAA-CREF FUNDS (TIAA-CREF SMALL-CAP BLEND INDEX FUND), TOUCHSTONE FUNDS GROUP TRUST (TOUCHSTONE ARBITRAGE FUND), (TOUCHSTONE CREDIT OPPORTUNITIES II FUND), TWO SIGMA INVESTMENTS LP, UNIFIED SERIES TRUST (SYMONS SMALL CAP INSTITUTIONAL FUND), VALUED ADVISERS TRUST (FOUNDRY PARTNERS FUNDAMENTAL SMALL CAP VALUE FUND), VANGUARD INDEX FUNDS (VANGUARD EXTENDED MARKET INDEX FUND), VANGUARD INDEX FUNDS (VANGUARD SMALL-CAP INDEX FUND), VANGUARD INDEX FUNDS (VANGUARD SMALL-CAP VALUE INDEX FUND), VANGUARD INDEX FUNDS (VANGUARD TOTAL STOCK MARKET INDEX FUND), VANGUARD INSTITUTIONAL INDEX FUNDS (VANGUARD INSTITUTIONAL TOTAL STOCK MARKET INDEX FUND), VANGUARD INSTITUTIONAL TOTAL STOCK MARKET INDEX TRUST, VANGUARD INTERNATIONAL EQUITY INDEX FUNDS (VANGUARD TOTAL WORLD STOCK INDEX FUND), VANGUARD RUSSELL 2000 VALUE INDEX TRUST, VANGUARD SCOTTSDALE FUNDS (VANGUARD RUSSELL 2000 INDEX FUND), VANGUARD SCOTTSDALE FUNDS (VANGUARD RUSSELL 2000 VALUE INDEX FUND), VANGUARD VALLEY FORGE FUNDS (VANGUARD BALANCED INDEX FUND), VANGUARD WORLD FUND (VANGUARD CONSUMER DISCRETIONARY INDEX FUND), WAYNE KULKIN, ZINE MAZOUZI, COMMUNITY INSURANCE COMPANY, PRINCIPAL FUNDS INC. (GLOBAL MULTI-STRATEGY FUND), RICHARD DICKSON, ROBERT L. METTLER, BLUE CROSS OF CALIFORNIA, DIVERSIFIED ALPHA GROUP TRUST, DT DV MARKET COMPLETION FUND, NICOLA GUARNA, HAWAII DE LLC, GEORGE M. KLABIN, LITMAN GREGORY MASTERS ALTERNATIVE STRATEGIES FUND, MASTER SMALL CAP INDEX SERIES OF QUANTITATIVE MASTER SERIES LLC, AKA ISHARES RUSSELL 2000 SMALL-CAP INDEX FUND, PG AND E CO. NUCLEAR FACILITIES QUALIFIED CPUC DECOMMISSIONING MASTER TRUST, RESEARCH AFFILIATES EQUITY U.S. LARGE, L.P., FKA ENHANCED RAFI U.S. LARGE LP, ROBERT RODRIGUEZ, VERICIMETRY U.S. SMALL CAP VALUE FUND, ROBERT AND SUSAN METTLER FAMILY TRUST U/A 3/27/06, ROBERT L. METTLER, SUSAN T. METTLER, TRUSTEES, BAM ADVISOR SERVICES, DBA LORING WARD, BLACKROCK MSCI USA SMALL CAP EQUITY INDEX FUND, BLUE SHIELD OF CALIFORNIA, DAGT SMALL CAP OUTLIERS, EXTENDED EQUITY MARKET FUND, AKA BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A., EXTENDED EQUITY MARKET MASTER FUND B, ISHARES EUROPE, ISHARES MORNINGSTAR SMALL-CAP VALUE ETF, ISHARES MSCI USA SMALL CAP UCITS ETF, ISHARES RUSSELL 2000 ETF, ISHARES RUSSELL 3000 ETF, GEORGE M PACIFIC SELECT FUND-PD SMALL-CAP VALUE INDEX

PORTFOLIO, PACIFIC SELECT FUND-SMALL-CAP EQUITY PORTFOLIO, PACIFIC SELECT-FUND-SMALL-CAP INDEX PORTFOLIO, RUSSELL 2000 ALPHA TILTS FUND B, RUSSELL 2000 INDEX FUND, RUSSELL 2000 INDEX NON-LENDABLE FUND, BLACKROCK RUSSELL 2000 INDEX NON-LENDABLE FUND, RUSSELL 2000 VALUE FUND B, RUSSELL 2500 INDEX FUND, AKA ISHARES RUSSELL SMALL/MID-CAP INDEX FUND, RUSSELL 3000 INDEX FUND, AKA ISHARES TOTAL U.S. STOCK MARKET INDEX FUND, SA U.S. SMALL COMPANY FUND, STATE STREET NORTH AMERICA CONFIDENTIAL CLIENT 1 DOMESTIC EQUITIES, STATE STREET NORTH AMERICA CONFIDENTIAL CLIENT 1 DOMESTIC ISHARES 405, STATE STREET NORTH AMERICA CONFIDENTIAL CLIENT 1 FOF, U.S. EQUITY MARKET FUND, U.S. EQUITY MARKET FUND B, MSCI U.S. IMI INDEX FUND B2, AKA BLACKROCK MSCI U.S. IMI INDEX FUND B2, MERRILL LYNCH PIERCE FENNER AND SMITH INCORPORATED, STATE STREET BANK AND TRUST CO., PACIFIC SELECT FUND - PD SMALL-CAP VALUE INDEX PORTFOLIO, RUSSELL 3000 INDEX NON-LENDABLE FUND, SCHWAB TOTAL STOCK M, U.S. SMALL COMPANY FUND, THE ARBITRATE FUND, DEF, ADVISORS SERIES TRUST (KELLNER MERGER FUND), DEFENDANT NY-1, BETH B. DORFSMAN, BROWN BROTHERS HARRIMAN AND CO. CLIENT NO. 2, BROWN BROTHERS HARRIMAN AND CO. CLIENT NO. 3, BRYAN R. GILLIGAN, CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., DYNAMIC CAPITAL MANAGEMENT, LLC, DYNAMIC OFFSHORE FUND LTD., FEDEX CORPORATION, DEFENDANT NY-8, GARDNER LEWIS EVENT DRIVEN FUND, L.P., GOTHAM ABSOLUTE RETURN FUND, GTE INVESTMENT MANAGEMENT CORP., HALLADOR BALANCED FUND LLC, HARTFORD MUTUAL FUNDS II INC. (HARTFORD SCHRODERS U.S. SMALL CAP OPPORTUNITIES FUND), HARVEST STREET CAPITAL LLC, DEFENDANT NY-18, DEFENDANT NY-19, LAURIE J. GENTILE, LEGG MASON ROYCE U.S. SMALL CAP OPPORTUNITY FUND, LINDA V. KOTHE, LORI L. GRACE, MFO MANAGEMENT COMPANY (TOWLE FUND), MICHAEL G. DEMKO, DEFENDANT NY-24, MINNESOTA MINING AND MANUFACTURING CO., PILLSBURY, PINNACLE WEST CORP., PRELUDE OPPORTUNITY FUND, LP, ROYCE FUND (ROYCE OPPORTUNITY FUND), STACEY A. HARMON, THE ARBITRAGE FUND, WISDOM TREE ASSET MANAGEMENT INC., WHITNEY L. SMITH, WCFS INC., VIRTU AMERICAS LLC, TUDOR TRADING I, LP, TRADITION SECURITIES AND DERIVATIVES INC., TOWLE CAPITAL PARTNERS II LP, TOWLE CAPITAL PARTNERS LP, THOMAS M. MURRAY PO N. MURRAY JT TEN, THE HARTFORD LIFE INSURANCE COMPANY, ALLIANZ GLOBAL INVESTORS OF AMERICA L.P, GARDNER LEWIS MERGER ARBITRAGE FUND, L.P., GARDNER LEWIS MERGER ARBITRAGE FUND II, L.P., ANTHEM HEALTH PLANS OF VIRGINIA, INC., DIMENSIONAL FUNDS PLC U.S. SMALL COMPANIES FUND, AKA IRISH

7

U.S. SMALL CAP FUND, INVESTMENT MANAGERS SERIES TRUST (TOWLE DEEP VALUE FUND), CALIFORNIA PHYSICIANS' SERVICE, DBA BLUE SHIELD OF CALIFORNIA, TOWLE DEEP VALUE FUND, ALLIANZ ASSET MANAGEMENT OF AMERICA L.P., FKA ALLIANZ GLOBAL INVESTORS OF AMERICA LP, COLLEGE RETIREMENT EQUITIES FUND (CREF EQUITY INDEX ACCOUNT), TOUCHSTONE FUNDS GROUP TRUST (TOUCHSTONE MERGER ARBITRAGE FUND), TOUCHSTONE FUNDS GROUP TRUST (TOUCHSTONE CREDIT OPPORTUNITIES II FUND), WISDOMTREE U.S. SMALLCAP DIVIDEND FUND, FKA WISDOMTREE SMALLCAP DIVIDEND FUND, WISDOMTREE U.S. SMALLCAP FUND, FKA WISDOMTREE SMALLCAP EARNINGS FUND, JOHN W. DEEM,

*Defendants*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

Before:    CHIN, SULLIVAN, and BIANCO, *Circuit Judges*.

---

Consolidated appeals from a judgment and orders of the United States District Court for the Southern District of New York (Rakoff, *J.*), dismissing claims arising from the leveraged buyout of an apparel and footwear company in 2014 and the bankruptcy filing of its successor in 2018. The bankruptcy trustees brought suit against defendants-appellees -- officers, directors, and shareholders of the company -- claiming breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraudulent conveyance, unjust enrichment, and various state law violations. The bankruptcy trustees allege that

8

the officers and directors arranged for the original company to merge with an affiliate of a private equity company and sold off its most valuable businesses to the private equity company's other affiliates at a fraction of their value, leaving the surviving company with over $1.5 billion in debt, of which more than $1 billion was prior debt, and without its most successful product lines. The district court dismissed the claims on the ground that the relevant transactions were shielded by the Bankruptcy Code's § 546(e) safe harbor provision.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judge Sullivan concurs in part and dissents in part in a separate opinion.

---

EDWARD A. FRIEDMAN (Robert J. Lack, Stan Chiueh, *on the brief*), Friedman Kaplan Seiler & Adelman LLP, New York, New York, *for Plaintiffs-Appellants Marc S. Kirschner* and *Wilmington Savings Fund Society, FSB, in all appeals except Docket Numbers 20-3334 and 20-3335.*

ALLAN B. DIAMOND *and* RYAN M. LAPINE, Diamond McCarthy LLP, Dallas, Texas and Los Angeles, California, *for Plaintiffs-Appellants Marc S. Kirschner* and *Wilmington Savings Fund Society, FSB, in Docket Numbers 20-3257, 20-3290, 20-3334, 20-3335, 20-3964, and 20-3980.*

GREGG L. WEINER (Adam M. Harris and Andrew G. Devore, *on the brief*), Ropes & Gray LLP, New York, New York and Boston, Massachusetts, *for Defendants-Appellees Public Shareholders (Robeco Capital Growth Funds, et al.).*

Y. DAVID SCHARF (Danielle C. Lesser, *on the brief*), Morrison Cohen LLP, New York, New York, *for Defendants-Appellees Individual Shareholders Mary E. Belle, Kathleen Nedorostek Kaswell,* and *Joseph Stafiniak.*

HOWARD SEIFE, Norton Rose Fulbright US LLP, New York, New York, *for Defendant-Appellee Individual Shareholder Wayne Kulkin.*

STUART KAGEN *and* CHRISTOPHER GREENE, Kagen, Caspersen & Bogart, PLLC, *for Defendants-Appellees Individual Shareholders Katherine Butler, Linda Kothe, Richard Hein, Richard H. Hein Rev. Trust U/A 06/12/95, Mark DeZao, Janice Brown, Eric Dauwalter, Rosa Genovesi, Charles Pickett, Susan McCoy, Stacey Harmon, Kathleen O'Brien, James Capiola, Laurie Gentile,* and *Robyn Mills.*

KEVIN J. O'CONNOR *and* SHANNON D. AZZARO, Peckar & Abramson, P.C., New York, New York, *for Defendants-Appellees Individual Shareholders Heather Harlan* and *George Sharp.*

10

CHIN, *Circuit Judge*:

These cases arise from the leveraged buyout and subsequent bankruptcy of apparel and footwear company Jones Group, Inc. ("Jones Group"), which housed brands such as Nine West, Anne Klein, Stuart Weitzman, and Kurt Geiger. In 2014, private equity firm Sycamore Partners ("Sycamore") acquired Jones Group through a merger with one of its subsidiaries and renamed the surviving company Nine West Holdings, Inc. ("Nine West"). At the close of the merger, Sycamore sold three of Nine West's brands to newly formed Sycamore affiliates. A few years later, Nine West declared bankruptcy.

Plaintiffs-appellants Marc Kirschner, as the Litigation Trustee for the Nine West Litigation Trust representing unsecured creditors, and Wilmington Savings Fund, FSB, as successor Indenture Trustee for various notes issued by Nine West (together, the "Trustees"), brought seventeen actions in different states against Jones Group's former directors and officers for unjust enrichment and against its former public shareholders for fraudulent conveyance, claiming that the directors and officers arranged the merger and sold the company's most valuable assets at a fraction of their value to consolidate debt with Nine West and place Jones Group's most successful product lines outside the reach of Nine

11

West's creditors. The Judicial Panel on Multidistrict Litigation transferred the cases to the Southern District of New York for coordinated or consolidated pretrial proceedings. Both the public shareholders and the directors and officers moved to dismiss the claims against them, arguing that payments made to them in connection with the merger are shielded by the Bankruptcy Code's § 546(e) safe harbor. On August 27, 2020, the district court (Rakoff, *J.*) granted both motions to dismiss, holding that the payments were shielded by the safe harbor, as interpreted by *In re Tribune Co. Fraudulent Conv. Litig. (Tribune II)*, 946 F.3d 66, 72 (2d Cir. 2019), *cert. denied sub nom. Deutsche Bank Tr. Co. Americas v. Robert R. McCormick Found.*, 141 S. Ct. 2552 (2021). Plaintiffs appeal.

We AFFIRM in part, VACATE in part, and REMAND for further proceedings.

## *BACKGROUND*

When reviewing a district court's grant of a motion to dismiss, we accept the material facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff -- here, the Trustees. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 147 (2d Cir. 2021).

12

## I.    *The Facts*

The following facts are drawn from the Trustees' seventeen complaints, the exhibits attached thereto, and documents integral to and referenced in them.  *See Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018).  We cite, as the district court did, specifically to the amended complaint filed in *Kirschner et al. v. McClain et al.*, No. 20-cv-4262, Dkt. No. 110 (the "Complaint"), though all cited allegations are also found in the other operative complaints.

### A.    The Merger

In 2013, Sycamore proposed to acquire Jones Group through a leveraged buyout ("LBO") transaction (the "Merger").  In preparation for the Merger, Sycamore created a holding company called Jasper Parent LLC ("Jasper Parent") and another entity called Jasper Merger Sub, Inc. ("Jasper Merger Sub"), a wholly owned subsidiary of Jasper Parent.

On December 19, 2013, Jones Group, Jasper Parent, and Jasper Merger Sub entered into an agreement (the "Merger Agreement"), which governed the terms of the Merger.  Pursuant to the Merger Agreement, Jones

13

Group merged with Jasper Merger Sub and continued as the surviving corporation -- Nine West.

### 1. The Certificate and DTC Transfers

The Merger Agreement outlined the terms for public shareholders to receive payments upon cancelation of their shares in Jones Group. Jones Group's former public shareholders (the "Public Shareholders") received $15 for each share of common stock they owned when the Merger closed. To implement those payments, the Merger Agreement called for a "paying agent" to be hired "pursuant to a paying agent agreement in customary form." J. App'x at 383 § 4.2(a). Jasper Parent and Jones Group hired Wells Fargo to act as a paying agent. The Paying Agent Agreement (the "PAA") stated that the surviving corporation -- Jones Group -- "desires that the Paying Agent act as its special agent for the purpose of distributing the Merger Consideration" to the Public Shareholders. J. App'x at 217. [1]

The Merger Agreement further provided that Jasper Parent would deposit with the Paying Agent -- Wells Fargo -- the aggregate amount of the merger consideration to be paid to the Public Shareholders. The paying agent

---

[1] Although the PAA identifies Jones Group as the surviving corporation, Jones Group thereafter merged with subsidiaries and eventually became Nine West.

was to distribute these payments to the Public Shareholders. A majority of Jones Group shares were held as of record by Depository Trust Company ("DTC") or in electronic book-entry form, although some shareholders held physical certificates. Accordingly, we refer to these payments as the as the "DTC Transfers" and the "Certificate Transfers," respectively.

Pursuant to the PAA, Nine West deposited $1.101 billion in an account at Wells Fargo for the purpose of paying the DTC Transfers and $4 million for the purpose of paying the Certificate Transfers. The PAA outlined in detail how Wells Fargo was to effectuate the payments. Wells Fargo ultimately distributed the payments to the Public Shareholders.

### 2. The Payroll Transfer

The Merger Agreement also set forth the terms for former directors, officers, and employees of Jones Group (the "Individual Shareholders") to receive payment for their restricted shares, share-equivalent units, and accumulated dividends on restricted stock at the close of the merger (the "Payroll Transfer"). Pursuant to the Merger Agreement, Jones Group paid $78 million to the Individual Shareholders for those shares "through the payroll and by other

means." J. App'x at 166 ¶ 135; *see also id.* at 385. Wells Fargo was not involved in these transactions.

## B. The Alleged Fraudulent Conveyances

At the close of the Merger, Sycamore sold three of the brands housed by newly-renamed-Nine West -- Stuart Weitzman, Kurt Geiger, and Jones Apparel (the "Carveout Assets") -- to then-recently formed Sycamore affiliates (the "Carveout Transactions"). The Trustees contend that, in doing so, Sycamore "transferred some of Jones Group's most valuable assets to Sycamore's affiliates -- beyond the reach of Jones Group's creditors -- for substantially below fair market value." J. App'x at 142 ¶ 61(e). These transactions rendered the remaining Nine West business insolvent and "guaranteed that [Sycamore] would profit handsomely . . . no matter what happened to the post-LBO [Nine West]." J. App'x at 142 ¶ 62; *see also id.* at 164 ¶ 130.[2]

---

[2]  As the Public Shareholders highlight in their briefing, the Trustees "do not allege that the Public Shareholders were in any way involved in these Carveout Transactions, which were approved by the post-LBO board *after* ownership of the company transferred to Sycamore." Appellee's Br. at 10 (citing J. App'x at 143 ¶ 66, 166 ¶ 136).

## C. The Bankruptcy

On April 6, 2018, Nine West and several affiliate debtors filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York. On February 27, 2019, the Bankruptcy Court confirmed a reorganization plan (the "Plan").

Pursuant to the Plan, Sycamore paid Nine West's estate $120 million, which covered the Carveout Transactions and thus the fraudulent transfer claims.

## II. *The Proceedings Below*

### A. The Consolidated Cases

Beginning in February 2020, Trustees commenced nineteen actions against more than 175 of Jones Group's former directors, officers, and shareholders in various jurisdictions, seeking, in part, to avoid allegedly fraudulent payments made to them in connection with the LBO. Two of the nineteen actions were voluntarily dismissed without prejudice, and are not part of this appeal. The suits were transferred in multidistrict proceedings to the Southern District of New York, where they were consolidated.

## B. The Motions to Dismiss

On June 29, 2020, pursuant to a two-phase briefing schedule set by the district court, the Public Shareholders filed motions to dismiss all fraudulent conveyance claims under the Bankruptcy Code's "safe harbor" provision. *See* 11 U.S.C. § 546(e). The Individual Shareholders joined the motions. The safe harbor defense limits a Chapter 11 bankruptcy trustee's power to avoid a transfer that is a settlement payment, as defined by the Code, made by or to (or for the benefit of) a financial institution, except in cases relating to actual fraudulent conveyance claims under § 548(a)(1)(A). *See* 11 U.S.C. § 546(e).

On August 27, 2020, the district court dismissed seven of the seventeen actions, including the Trustees' fraudulent conveyance and unjust enrichment claims, relying in part on this Court's decision in *Tribune II*, 946 F.3d 66 (2d Cir. 2019).[3] It found that 11 U.S.C. § 546(e) barred plaintiffs' fraudulent conveyance claims and, consequently, preempted their unjust enrichment

---

[3] The dismissed actions were: 20-cv-4286, 20-cv-4289, 20-cv-4299, 20-cv-4434, 20-cv-4440, 20-cv-4479, and 20-cv-4480. Ten of the seventeen actions remain pending because each includes claims against directors, officers, or employees that have not been dismissed.

claims.[4] On November 18, 2020, the district court granted certification pursuant to Federal Rule of Civil Procedure 54(b) for entry of partial final judgment dismissing the claims. These consolidated appeals followed.

## STANDARD OF REVIEW

We review *de novo* a district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *Giunta v. Dingman*, 893 F.3d 73, 78-79 (2d Cir. 2018). We also review *de novo* a district court's Rule 12(b)(6) dismissal based on an affirmative defense. *See Force v. Facebook, Inc.*, 934 F.3d 53, 62 (2d Cir. 2019).

A district court may grant a motion to dismiss for failure to state a claim on the basis of an affirmative defense only when facts supporting the defense appear on the face of the complaint. *See, e.g.*, *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) ("Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises a statutory bar . . . as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take

---

[4] The district court dismissals were limited to the payments associated with common shares, restricted shares, share equivalent units, and accumulated dividends. It did not dismiss the unjust enrichment claims related to the change in control payments.

19

judicial notice, that the plaintiff's claims are barred as a matter of law.") (citation omitted). For purposes of this standard, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted).

## *DISCUSSION*

The Trustees contend that the payments they seek to avoid are not protected by the Bankruptcy Code's safe harbor and thus they ask this Court to reverse the district court's judgment dismissing their claims.

These cases present two main questions. First, the parties disagree as to the scope of the term "financial institution" as defined in 11 U.S.C. § 101(22)(A). The Trustees argue that the definition encompasses bank customers only in transactions where the bank is acting as their agent, while defendants argue that it applies to any transaction related to a securities contract so long as the bank acted as their agent at one point in connection with that contract. Second, the parties dispute whether Wells Fargo acted as Nine West's agent in the transactions at issue. There are three relevant transactions:

(1) the Certificate Transfers -- Nine West deposited approximately $4 million with Wells Fargo, which, pursuant to the PAA,

20

distributed checks or wire transfers to the paper stock shareholders in exchange for their shares;

(2) the DTC Transfers -- Nine West deposited approximately $1.101 billion with Wells Fargo, which, pursuant to the PAA, distributed checks or wire transfers to the book-entry shareholders in exchange for their shares; and

(3) the Payroll Transfers -- Nine West paid $78 million to Jones Group's directors, officers, and employee shareholders through its payroll program.

We hold that, for these purposes, "financial institution" includes bank customers only in transactions where the bank is acting as their agent and that Wells Fargo acted as Nine West's agent in the Certificate and DTC Transfers but not in the Payroll Transfers. We conclude, further, that under the transfer-by-transfer interpretation of § 101(22)(A), Nine West was a "financial institution" with respect to the Certificate and DTC Transfers and those payments are therefore safe harbored under § 546(e). The Payroll Transfers, however, are not so shielded.

## I. Statutory Background

The Bankruptcy Code identifies "circumstances under which a trustee" may set aside (or avoid) "certain types of transfers and recapture the value of those avoided transfers for the benefit of the estate." *Merit Mgmt. Grp.*,

21

*LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018) (citing 11 U.S.C. §§ 544-53) (cleaned up). It also provides, however, "a number of limits on the exercise of these avoiding powers." *Id.* at 889.

Section 546(e) of Chapter 11 of the Bankruptcy Code precludes avoidance of "settlement payment[s] . . . made by or to (or for the benefit of) a . . . financial institution, . . . or . . . transfer[s] made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract . . . ." 11 U.S.C. § 546(e). The Code defines "financial institution" to include not only banks, but also a customer of a bank "when [the bank] is acting as agent or custodian for a customer . . . in connection with a securities contract." *Id.* § 101(22)(A).[5]

The two leading cases interpreting the safe harbor provision are *Merit Management*, 138 S. Ct. 883 (2018), and *Tribune II*, 946 F.3d 66 (2d Cir. 2019). The Supreme Court held in *Merit Management*, 138 S. Ct. at 892, and we recognized in *Tribune II*, 946 F.3d at 77, that § 546(e) does "not protect transfers in which financial institutions served as mere conduits." In *Tribune II*, however, we concluded that an agency relationship provided an "alternative basis for finding that the payments [were] covered." 946 F.3d at 77; *see also* 11 U.S.C. § 101(22)(A).

---

[5]    11 U.S.C. § 741(7) defines the term "securities contract" broadly.

22

There, we held that Computershare Trust Company ("Computershare"), a trust company and bank that the Tribune Company had hired as a depositary and paying agent, acted as the Tribune Company's "agent" in connection with the underlying LBO securities contract, rendering the Tribune Company a "financial institution" and triggering the safe harbor for payments made in the LBO to the Tribune Company's public shareholders. 946 F.3d at 77-81.

Section 546(e) has been uniformly recognized as an affirmative defense, though not yet by this Court.[6] We have, however, held that safe harbors in other statutory schemes are affirmative defenses.[7] Accordingly, we hold today that 11 U.S.C. § 546(e) is an affirmative defense.

Defendants therefore bear the burden of demonstrating that the transfers fall within the safe harbor. *See, e.g.*, *Capitol Records*, 826 F.3d at 94.

---

[6] *See* 3 Howard J. Steinberg & Roy S. Geiger, Bankruptcy Litigation § 17:128, *Responsive pleadings: Affirmative defenses* (Oct. 2022), Westlaw BKRLIT (collecting cases); *see also In re Tronox Inc.*, 503 B.R. 239, 339 (Bankr. S.D.N.Y. 2013) ("Cases construing § 546(e) have uniformly treated it as an affirmative defense.").

[7] *See, e.g.*, *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016) (holding that the Digital Millennium Copyright Act's service provider safe harbor is an affirmative defense that "must be raised by the defendant" and explaining "[t]he defendant undoubtedly bears the burden of raising entitlement to the safe harbor and of demonstrating that it has the status of a service provider"); *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (holding that "ERISA preemption of state contract claims in a benefits-due action is an affirmative defense that is . . . subject to waiver, if not pleaded in the defendant's answer.").

Plaintiffs are under no obligation to plead facts supporting or negating an affirmative defense in the complaint. *See, e.g., Picard v. Citibank N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 195 (2d Cir. 2021) (first citing Fed. R. Civ. P. 8(c); and then citing *Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1987 n.9 (2017) ("An affirmative defense to a plaintiff's claim for relief is not something the plaintiff must anticipate and negate in her pleading." (cleaned up))), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022).

## II.     Qualifying Participant

The payments at issue are safe harbored only if (1) Nine West, which made the payments, was a covered entity; or (2) the shareholders, who ultimately received the payments, were covered entities. *See Tribune II*, 946 F.3d at 77. Nine West is a covered entity if it is considered a "financial institution" under § 101(22)(A). 11 U.S.C. § 101(22)(A).

The district court interpreted section 546(e) of Chapter 11 of the Bankruptcy Code to mean that "when a bank is acting as an agent for a customer in connection with a securities contract, that customer counts as a 'financial institution,' for the purposes of the § 546(e) safe harbor." 482 F. Supp. 3d 187, 199 (S.D.N.Y. 2020). It therefore held that Nine West qualified as a "financial

24

institution" and that all the transfers at issue were protected by the safe harbor. *Id*.

The Trustees take issue with the district court's interpretation of 11 U.S.C. § 101(22)(A). The district court found that Wells Fargo acted as Nine West's agent with respect to the Certificate Transfers and did not analyze the other transfers. Rather, it employed a "contract-by-contract" interpretation of § 101(22)(A) and concluded that, because Wells Fargo acted as Nine West's agent in the Certificate Transfers, and those transfers were made in connection with the Merger Agreement, Wells Fargo must be considered Nine West's agent for every transfer made in connection with that contract and therefore any transfer made in connection with the LBO. Accordingly, it found that § 546(e) insulated all transfers made in connection with the LBO from avoidance, including (1) the DTC Transfers, in which Wells Fargo had a limited role; and (2) the Payroll Transfers, in which Wells Fargo played no role whatsoever. The Trustees and amici argue that this Court's holding in *Tribune II* does not support such a reading of § 101(22)(A). We agree that the district court erred in applying a "contract-by-contract" analysis, and conclude that the safe harbor applies only to the Certificate and DTC Transfers and not to the Payroll Transfers.

25

We hold that § 101(22)(A) must be interpreted using a "transfer-by-transfer" approach based on: (1) the language of the statute, (2) the statutory structure, and (3) the purpose of the safe-harbor provision.

First, the Bankruptcy Code defines a "financial institution" to include a "customer" of a bank or other such entity "when" the bank or other such entity "*is acting as agent*" for the customer "in connection with a securities contract," 11 U.S.C. § 101(22)(A) (emphasis added). It does not provide that a customer is covered when a bank has *ever* acted as a customer's agent in connection with a securities contract. In other words, the text creates a link between a bank "acting as agent" and its customer with respect to a transaction. To satisfy that link, the plain language of § 101(22)(A) indicates that courts must look to each transfer and determine "when" a bank "*is acting as agent*" for its customer for a transfer, assuming, of course, the transfer is made in connection with a securities contract.

To the extent the language of the statute is ambiguous, the transfer-by-transfer approach is the more logical and reasonable interpretation. A contract-by-contract interpretation of § 101(22)(A) would lead to the absurd result of insulating every transfer made in connection with an LBO, as long as a bank served as agent for at least one transfer. Courts should interpret statutes to

26

avoid absurd results. *See United States v. Wilson*, 503 U.S. 329, 334 (1992); *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000). Indeed, at oral argument, counsel for the Individual Shareholders did not provide a clear answer when asked when, if ever, a transaction would fall outside the scope of § 546(e). Likewise, if this were indeed the law, we cannot imagine a circumstance in which a debtor would choose to structure an LBO without involving a bank, even in only a purely ministerial capacity.[8] Under the contract-by-contract approach, the Payroll Transfers in this case would be covered by the safe-harbor provision even though Wells Fargo had nothing to do with the $78 million in transfers paid through the payroll program.

Second, the structure of the Bankruptcy Code supports the transfer-by-transfer interpretation. As described above, the Code grants trustees the authority to set aside or avoid certain transfers and recoup their value for the estate. *Merit Mgmt.*, 138 S. Ct. at 888. While these general avoidance powers "help implement the core principles of bankruptcy," they are not unfettered. *See*

---

[8] For examples of parties "'structur[ing]' their way out of liability under avoiding power statutes," *see* Ralph Brubaker, *Understanding the Scope of the § 546(e) Securities Safe Harbor Through the Concept of the "Transfer" Sought To Be Avoided*, 37 Bankr. L. Letter 1 n.4 (July 2017) (quoting Jonathan M. Landers & Sandra A. Riemer, *A New Look at Fraudulent Transfer Liability in High Risk Transactions*, BUS. L. TODAY, 1, 3 (Dec. 2016)).

*id.* (citation omitted).  One limitation on trustees' avoidance powers is § 546(e)'s safe harbor provision.  *Id.*  To interpret that limitation broadly under the contract-by-contract interpretation would be to undermine the avoidance powers that are so crucial to the Bankruptcy Code.

Third, the purpose of the safe harbor provision further supports the transfer-by-transfer interpretation.  Congress enacted the safe harbor in 1982 to shield certain transfers that, if avoided by trustees, could trigger systemic risk in financial markets.  *See* Brubaker, *supra*, at 1, 13; *see also Merit Mgmt.*, 138 S. Ct. at 889-90 (citing Brubaker and providing more historical context).  Interpreting the safe harbor as broadly as defendants suggest would limit the avoidance power even where it would not threaten the financial system -- an expansion of the safe harbor provision likely not intended by Congress.  As we noted in *Tribune II*, "[t]he broad language used in Section 546(e) protects *transactions* rather than firms, reflecting a purpose of enhancing the efficiency of securities markets in order to reduce the cost of capital to the American economy."  946 F.3d at 92 (emphasis added) (citation omitted).  Here, the Payroll Transfers were not paid through Wells Fargo and Congress's concerns about the settlement of securities transactions are not implicated.  *See id.* at 90.

The district court erred in adopting a "contract-by-contract" approach to hold that once Wells Fargo acted as Nine West's agent in one transaction, it is considered Nine West's agent in all the transactions. Applying the transfer-by-transfer interpretation of 11 U.S.C. § 101(22)(A), we conclude that the Certificate and DTC Transfers are protected by the safe harbor, but the Payroll Transfers are not.

A.    *Certificate and DTC Transfers*

The Public Shareholders argue that the Trustees' own pleading and documents demonstrate that Nine West hired Wells Fargo as an agent to effectuate payments to its shareholders in an LBO, the same role that Computershare played in *Tribune II*, thereby triggering the safe harbor for all payments made in the LBO to the Public Shareholders. We agree, but only as to the Certificate and DTC Transfers.

The Complaint alleges and related documents show that Wells Fargo made payments to, and received information from, the Public Shareholders during the Certificate and DTC Transfers. It did so on behalf of Nine West, and Nine West maintained control over the transactions. Thus, under *Tribune II*, Wells Fargo acted as Nine West's agent during those

29

transactions as a matter of law. *See* 482 F. Supp. 3d at 202 ("Wells Fargo was entrusted with millions of dollars of Nine West cash and was tasked with making payments on Nine West's behalf to Shareholders upon the tender of their stock certificates to Wells Fargo.") (cleaned up). In other words, facts supporting the applicability of the § 546(e) defense to the Certificate and DTC Transfer claims appear on the face of the Complaint, and the district court was correct in dismissing those claims.

B. *Payroll Transfers*

The same cannot be said of the Payroll Transfers. As to those transfers, the Complaint suggests that Wells Fargo did not make any payments on behalf of Nine West. The Complaint alleges that the Payroll Transfers "were processed through the payroll and by other means." J. App'x at 166 ¶ 135 (alleging that the Payroll Transfer payments "were processed through the payroll and by other means"); 482 F. Supp. 3d at 205 ("Unlike the common share payments, . . . which were effectuated through Wells Fargo, plaintiffs allege that the payments for restricted shares, share equivalent units, and accumulated dividends 'were processed through the payroll and by other means.'"). In any event, it is undisputed that Jones Group's payroll processor, Automated Data

30

Processing, Inc. ("ADP") -- not Wells Fargo -- made the payments, which totaled

$78 million.[9]  Two questions are thus presented: first, whether Wells Fargo took

any other relevant action that created an agency relationship with Nine West

during that transaction; and second, whether any such action rendered it Nine

West's agent as a matter of law.

The parties disagree about the mechanism by which the restricted

shares and share-equivalent units were canceled and, therefore, about the role

Wells Fargo played in that transaction.  The Trustees argue that Wells Fargo

played little or no role in the Payroll Transfers because (1) ADP made the

payments and (2) the shares were automatically canceled by operation of law

under the Merger Agreement.[10]  In contrast, the Individual Shareholders argue

---

[9]    At oral argument, counsel for the Individual Shareholders conceded that ADP in fact made the payments.  *See* Oral Argument at 24:52-25:00, *In re Nine West LBO Sec. Litig.* (No. 20-3257 (L)), https://ww3.ca2.uscourts.gov/oral_arguments.html; *see also* Appellants' Br. at 8 ("Discovery obtained while the motions to dismiss were pending confirmed that these transfers were processed by ADP, a payroll processor, which is neither a bank nor an agent.").

[10]    *See* Appellants' Br. at 10 ("The Merger Agreement gave the paying agent no authority to make any payment on account of restricted stock, accumulated dividends on restricted stock, or share equivalent units that were the subject of the Payroll Transfers."), 13-14 (Wells Fargo "played no role" in the Payroll Transfer), 49 ("[T]he shares were canceled and simply ceased to exist.").  At oral argument, plaintiffs' counsel argued Wells Fargo's role as a transfer agent -- what he described as stamping the word "canceled" on a certificate -- is not indicative of Nine West controlling Wells Fargo as a paying agent.  *See* Oral Argument at 33:02-32.

that Wells Fargo completed a "critical element" that was "inherent" to the transaction by canceling the shares and thus that it acted as Nine West's agent during that transaction.[11]  They do not elaborate on what that role entailed.

We agree with the Trustees that the face of the Complaint and relevant documents, viewed in a light most favorable to them, do not demonstrate the existence of an agency relationship between Wells Fargo and Nine West during the Payroll Transfers.  To the extent Wells Fargo played any role in that transaction, the Complaint plausibly alleges the role was purely ministerial because the shares were canceled automatically under, for example, the Merger Agreement provision that "all Restricted Shares and Share Equivalent Units . . . shall automatically cease to exist" at the close of the Merger.  J. App'x at 386 § 4.3(c).

The Individual Shareholders ask us to ignore the Complaint and the Merger Agreement and look instead to the PAA.  They first cite PAA § 1.3, which provides that Nine West "instructs and authorizes [Wells Fargo] to cancel all" restricted shares upon delivery and at the close of the merger.  J. App'x at 218 § 1.3.  They then point to other provisions of the PAA that indicate Wells Fargo

---

[11]    Oral Argument at 25:40, 26:11.

32

acted as Nine West's agent during the Certificate and DTC Transfers.  Appellee's Br. at 36-37.  For example, PAA § 4.2 provides that Nine West will reimburse Wells Fargo for expenses incurred in connection with its duties as *paying agent*, § 4.6 provides that Nine West will indemnify Wells Fargo for damages arising from its role as *paying agent*, and § 5.3 outlines Wells Fargo's responsibilities in handling confidential data.[12]  The Individuals Shareholders do not acknowledge, however, that Wells Fargo acted not as a paying agent with respect to the Payroll Transfers, as it did in the Certificate and DTC Transfers, but as a transfer agent only.[13]

The Individual Shareholders argue that because the PAA (1) "instructs" Wells Fargo "to cancel" the shares involved in the Payroll Transfers, and (2) establishes that Wells Fargo acted as Nine West's agent during the Certificate and DTC Transfers, it also establishes that Wells Fargo acted as Nine West's agent during the Payroll Transfers.  We disagree.  The PAA does not preclude the shares' automatic cancelation under the Merger Agreement, and it is

---

[12]    The Individual Shareholders do not cite PAA § 2.10, which provides that Wells Fargo "shall maintain" certain records related to cancelation of the shares, as "required by applicable law and regulation," J. App'x at 221, but that section arguably supports their position that Wells Fargo's role was more than purely ministerial.

[13]    *See, e.g.*, J. App'x at 217 (specifically excluding the Restricted Shares when defining Wells Fargo's responsibilities as paying agent).

at least plausible that cancelation was automatic. At best, Wells Fargo's role in canceling the shares, if any, is unclear. And to the extent Wells Fargo played any role, the record suggests that it was purely ministerial.

Even assuming, however, the Complaint and related documents establish that Wells Fargo played even a ministerial role in canceling the shares, the next question is whether that action rendered it Nine West's agent as a matter of law. The answer is no, at least at this juncture of the case.

The common law meaning of "agent" applies to 11 U.S.C. § 101(22)(A). *Tribune II*, 946 F.3d at 79. At common law, an agency relationship is created when a principal manifests assent to an agent that the agent will act on the principal's behalf and be subject to the principal's control, and the agent manifests assent to the same. *Id.* (citing Restatement (Third) of Agency § 1.01 (2006)). In *Tribune II*, we held that an agency relationship was created when Tribune entrusted Computershare to pay its tendering shareholders, among other things. *Id*. at 79. Here, Wells Fargo took some undefined ministerial action to cancel shares and, pursuant to PAA § 2.10, maintained related records as "required by applicable law and regulation." J. App'x at 221 (PAA § 2.10). The parties undoubtedly agreed that Wells Fargo would act on Nine West's behalf,

but, at this stage, it is not clear Nine West had any authority to control Wells Fargo's actions in canceling the shares. Because the control element is lacking, Wells Fargo's role as a transfer agent in the Payroll Transfers is more accurately understood as that of an independent contractor, not an agent, as required by § 101(22)(A).

Congress enacted the § 546(e) safe harbor to promote finality and certainty for investors by limiting the circumstances under which securities transactions could be unwound by, for example, a successful fraudulent conveyance action.[14] This Court's decision in *Tribune II* has already been criticized as broadening *Merit*'s[15] interpretation of the safe harbor.[16] Affirming the district court's dismissal of the Payroll Transfer claims based on Wells Fargo's role in canceling the shares would have even more drastic implications.

To further expand the scope of § 546(e) and § 101(22)(A) and immunize transactions in which a bank took only purely ministerial action, made no payments, and had no discretion would not further Congress's purpose.

---

[14] *See Tribune II*, 946 F.3d at 92 (citing H.R. Rep. No. 101-484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224).

[15] 138 S. Ct. at 888.

[16] *See, e.g.*, Amicus Br. at 3 (characterizing *Tribune II*'s holding as a "broad construction" of § 546(e) and § 101(22)(A), as explained in *Merit*).

Rather, it would introduce inefficiency into the securities market.  As amici explain in their Brief, such a decision would incentivize "large banks to aid and abet corporate looters" in LBOs because they could take little-to-no action on behalf of the debtor, "handsomely profit by collecting large structuring fees," and rest assured they remain immune from liability.[17]

Accordingly, we vacate the district court's judgment to the extent it dismissed the Payroll Transfer claims.

## III.  *Qualifying Transaction*

As we have determined that Nine West is a qualifying participant pursuant to § 546(e) with respect to the Certificate and DTC Transfers, we must next determine whether these payments are qualifying transactions under the safe harbor.  A payment constitutes a qualifying transaction if it is a "settlement payment" or a "transfer made . . . in connection with a securities contract."  11 U.S.C. § 546(e).

---

[17]  Amicus Br. at 29; *see also id.* ("If the District Court's decision is affirmed, it would make it virtually impossible for a Trustee to ever bring a [fraudulent conveyance claim] against shareholders in the context of a high-risk LBO, unless the purchaser walks into the closing with a giant bag of cash to pay the selling shareholders.  Such a result would not only lead to the proliferation of risky and disastrous LBO's -- it would encourage them!").

The district court found "that the public shareholder transfers were made in connection with a securities contract" for two reasons: (1) *Tribune II*, which similarly involved a two-step LBO transaction, controls; and (2) the safe harbor "covers not only contracts for the repurchase of securities but also any other 'similar' contract or agreement." 482 F. Supp. 3d at 198. We agree.

Plaintiffs' argument that the Merger Agreement is not a "securities contract" because it provided for the cancelation of Jones Group shares is without merit. First, the merger agreement in the Tribune LBO similarly provided for the cancelation of shares and, there, this Court had "no trouble" concluding that the payments were made "in connection with a securities contract." *Tribune II*, 946 F.3d at 81. Second, the Bankruptcy Code defines "securities contract" with "extraordinary breadth" to include, for example, a "contract for the purchase or sale of a security, including any repurchase transaction on any such security," as well as "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." *Tribune II*, 946 F.3d at 81 (cleaned up); *see also* 11 U.S.C. § 741(7)(A)(i), (vii).

The district court also correctly held, in the alternative, "that the payments made to the shareholder defendants were 'settlement payments' -- that is, transfers of cash made to complete the merger." 482 F. Supp. 3d at 199.

Under the Bankruptcy Code, a "settlement payment" is "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). This Court has held that a settlement payment includes a "transfer of cash made to complete a securities transaction." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011) (cleaned up). Here, the Certificate and DTC Transfers were made pursuant to the Merger Agreement and for the purpose of effectuating the LBO. Therefore, the district court was correct to hold that these transfers qualified as settlement payments within the scope of § 546(e).

## IV. *Preemption*

The Litigation Trustee brought unjust enrichment claims against the former directors and officers who allegedly played a key role in advocating for or approving the Merger. The district court found these claims were preempted by

§ 546(e) because they seek the same remedy as the Trustees' fraudulent conveyance claims, which it found were safe harbored under that provision. The Litigation Trustee argues that the district court erred because the "unjust enrichment claims -- which are asserted only against certain former Jones Group directors and officers -- differ in nature from [the Trustees'] fraudulent conveyance claims asserted against all shareholder defendants." Appellants' Br. at 51.

In *Tribune II*, this Court addressed whether state law constructive fraudulent conveyance claims were preempted by § 546(e). 946 F.3d at 72. We analyzed § 546(e)'s plain language and legislative history, as well as its scope after the Supreme Court's holding in *Merit Management*. 946 F.3d at 77-98. We reasoned that § 546(e) "was intended to protect from avoidance proceedings payments by and to commodities and securities firms in the settlement of securities transactions or the execution of securities contracts" and, therefore, state law claims that conflict with this purpose are preempted. 946 F.3d at 90.

Here, the Trustees' unjust enrichment claims that arise from the Certificate and DTC Transfers conflict with the purpose of § 546(e). The claims that arise from the Payroll Transfers, however, do not similarly conflict with the

statute because these payments do not fall under the safe harbor. As a result, we hold that the Trustees' unjust enrichment claims arising from the Payroll Transfers are not preempted.

## *CONCLUSION*

For the reasons stated above, we VACATE the district court's judgment as to the Payroll Transfer claims, AFFIRM the remainder of the judgment, and REMAND for further proceedings consistent with this Court's decision.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting in part:

I agree with the majority that the safe harbor created by section 546(e) of the Bankruptcy Code applies to Wells Fargo's payments to common-stock owners under the merger agreement that facilitated Nine West's leveraged buyout (the "Merger Agreement").  I write separately to explain why, in my view, the safe harbor should also apply to transfers that Nine West itself made to holders of restricted shares under the Merger Agreement.  In reaching this conclusion, I reject the majority's "transfer-by-transfer" approach for assessing whether "customers" of "banks" are "financial institutions" under section 101(22)(A), which is central to determining whether the qualifying-participant requirement under section 546(e) is met.  Instead, I believe that the district court's "contract-by-contract" approach better comports with the plain meaning of section 101(22)(A)'s text and more faithfully gives effect to Congress's purpose in enacting section 546(e).  I would therefore affirm the district court's ruling in all respects.

## I.

Under the Bankruptcy Code, trustees possess broad powers to avoid fraudulent conveyances – that is, transfers an insolvent debtor makes for little to no consideration to certain parties – so that fraudulently transferred property can

be recaptured for the benefit of the bankruptcy estate and its creditors. *See* 11 U.S.C. §§ 548, 550(a), 551. Nevertheless, Bankruptcy Code section 546 contains provisions – known as safe harbors – that insulate from avoidance certain transfers made by a debtor. Of particular significance here is section 546(e), which creates a safe harbor for margin payments, settlement payments, and transfers made in connection with securities contracts. Section 546(e) provides, in relevant part, that "the trustee may not avoid a transfer that" (1) "is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial institution" or (2) "is . . . made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract." *Id.* § 546(e). Thus, to invoke the section 546(e) safe harbor, a transferee must identify both a qualifying transaction (*i.e.*, a settlement payment or a transfer made in connection with a securities contract) and a qualifying participant (*i.e.*, a financial institution). *See id.* § 546(e).

The Trustees seek to claw back to the bankruptcy estate a series of payments that Nine West made to its shareholders, directors, and officers under the Merger Agreement. *First*, the Trustees try to avoid transfers made to holders of common-stock shares – held either in electronic book-entry form or as physical certificates – that were cancelled and converted into the right to receive $15 per share

2

(the "DTC and Certificate Transfers"). *Second*, the Trustees attempt to avoid payments for shares of restricted stock and stock equivalent units that were held by the company's directors, officers, and employees, which were also cancelled and converted into the right to receive $15 per share, plus any unpaid dividends (the "Restricted Shares Transfers").[1] The issue we must decide on appeal is whether these transfers that Nine West and its agent Wells Fargo made to company shareholders are shielded by section 546(e) from the Trustees' avoidance powers.

## II.

To begin, the majority and I agree that the *qualifying-transaction* requirement under section 546(e) is satisfied for *all* of the DTC, Certificate, and Restricted Shares Transfers, since they were "transfer payment[s] . . . made in connection with a securities contract" or "settlement payment[s]." *Id.* § 546(e). Indeed, the Merger Agreement from the Nine West leveraged buyout was, in all relevant respects, identical to the "securities contract" in *Tribune*, which similarly cancelled shares and converted them into rights to cash payments. *See In re Trib. Co. Fraudulent*

---

[1] Relatedly, Nine West also paid approximately $71 million in change-in-control payments to its directors and officers. The Trustees concede that their claims relating to these change-in-control payments are "not a subject of this appeal." Trustees Br. at 6 & n.2.

3

*Conv. Litig.*, 946 F.3d 66, 80–81 (2d Cir. 2019); *compare also* J. App'x at 488–89 (Tribune Merger Agreement § 2.1(a)), *with id.* at 383 (Nine West Merger Agreement § 4.1(a)). The transfers were also "settlement payments," since they involved "transfer[s] of cash . . . made to complete a securities transaction." *Enron Creditors Recovery v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334–35 (2d Cir. 2011) (alteration omitted). This is true for not only the DTC and Certificate Transfers, *see* J. App'x at 383–85 (Merger Agreement §§ 4.1, 4.2), but the Restricted Shares Transfers as well, *see id.* at 385–86 (Merger Agreement § 4.3).

## III.

But the *qualifying-participant* inquiry is not so clear-cut. To identify a qualifying participant, courts look to whether the transfer was "made by or to (or for the benefit of) a . . . financial institution." 11 U.S.C. § 546(e). In turn, a "financial institution" is defined as (1) "a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally[ ]insured credit union, or receiver, liquidating agent, or conservator for such entity" or (2) a "customer" of one of these entities "when [the] entity is acting as agent or custodian for [the] customer

4

. . . in connection with a securities contract (as defined in section 741)." *Id.* § 101(22)(A).[2]

The majority and I agree that the qualifying-participant inquiry is straightforward for the DTC and Certificate Transfers. That is, these transfers were carried out by Nine West's agent, Wells Fargo, which was a qualifying participant for the simple reason that a "bank" is an enumerated entity under the first clause of section 101(22)(A). And since these transfers were also qualifying transactions, as discussed above, they are safe from the Trustees' avoidance powers under the section 546(e) safe harbor.

We disagree, however, as to whether Nine West itself was a qualifying participant when it made the Restricted Shares Transfers. This disagreement stems from our conflicting readings of the "customer clause" of section 101(22)(A), which states that a customer is a "financial institution" when an enumerated covered entity under that subsection is acting as an agent for the customer in connection with a securities contract. Put another way, we must decide whether a customer's status as a "financial institution" turns on whether its agent is acting

---

[2] Section 101(22)(B) also identifies a third type of "financial institution" – namely, "an investment company registered under the Investment Company Act of 1940" that is acting "in connection with a securities contract," 11 U.S.C. § 101(22)(B) – which is not relevant for purposes of this dissent.

in connection with the securities contract (the "contract-by-contract" approach) or whether its agent is acting in connection with the specific transfer made by the customer (the "transfer-by-transfer" approach).[3]

### A.

As is usually the case with statutory interpretation, the relevant inquiry begins – and ends – with the plain meaning of the statutory text. *See Ret. Bd. of the Policemen's Annuity & Ben. Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 165 (2d Cir. 2014); *see also Spadaro v. United States Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020) ("[W]hen the language of a statute is unambiguous, judicial inquiry is complete." (internal quotation marks omitted)).  It is appropriate then to start where the district court did by noting that section 101(22)(A) provides that "a customer of a bank qualifies as a financial institution 'when [the bank] is acting as agent . . . in connection with a securities contract.'"  Sp. App'x at 39 (quoting 11 U.S.C. § 101(22)(A) (alteration in original)).  Under the plain meaning of this

---

[3] To be clear, there are *two* "in connection with a securities contract" requirements at play here. One is found under the qualifying-transaction prong of section 546(e) itself. *See* 11 U.S.C. § 546(e). The other is found in the customer clause of section 101(22)(A), which implicates the qualifying-participant prong of section 546(e). *See id.* § 101(22)(A). The "contract-by-contract" versus "transfer-by-transfer" dispute relates to the interpretation of section 101(22)(A). It stands to reason, of course, that the securities contract for both sections must be the same for the safe harbor to apply, and here there is no question that all of the transfers were made pursuant to the same Merger Agreement.

6

statutory language, it follows that once a customer is deemed a "financial institution" because a bank is acting as its agent in connection with a securities contract (under the qualifying-participant prong), each and every transfer the customer makes pursuant to that securities contract (under the qualifying-transaction prong) is shielded by the section 546(e) safe harbor.

Indeed, it is telling that Congress elected to limit the scope of a customer's status as a "financial institution" by inserting the "in connection with a securities contract" language into the statute. 11 U.S.C. § 101(22)(A). Had Congress simply omitted this language, so that a customer of a bank is a "financial institution" "when" the "bank" "is acting as agent" of the customer, then there would be ambiguity as to whether "is acting as agent" should be construed broadly (*i.e.*, any agency relationship will suffice) or narrowly (*i.e.*, the agency relationship must pertain to a particular transfer). Here, Congress chose to pair "is acting as agent" with "in connection with a securities contract," thereby limiting a customer's "financial-institution" status to when its agent is acting in precisely that capacity. *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("The[] words [of a statute] cannot be meaningless, else they would not have been used.").

It also bears noting that, out of all the terms at its disposal, Congress settled on the phrase "securities contract (as defined in section 741)." This defined term is set forth in capaciously broad language under section 741(7). *See* 11 U.S.C. § 741(7)(A)(i), (vii) (defining "securities contract" as, among other things, "*any* . . . agreement . . . that is *similar* to" an agreement "for the . . . sale[] . . . of a security" (emphasis added)); *see also Tribune*, 946 F.3d at 81 (2d Cir. 2019) (acknowledging the "extraordinary breadth" of this definition (internal quotation marks omitted)). This indicates to me that, by incorporating this definition of "securities contract," Congress intended for the customer clause to be interpreted in an expansive manner.

The majority disputes this interpretation, opting instead for a narrower transfer-by-transfer approach to the customer clause. According to the majority, if Congress truly intended to enact the broad reading endorsed by the district court, it would have instead drafted section 101(22)(A) to say that a customer of a bank qualifies as a financial institution "when a bank has *ever* acted as a customer's agent in connection with a securities contract." Maj. Op. at 27. But Congress had no obligation to use the majority's proffered language, and in any event, the language it did use – "is acting as agent . . . in connection with a securities

contract," 11 U.S.C. § 101(22)(A) – is broad enough to reach the disputed transfers in this case, without being as boundless as the majority implies. In fact, it is the majority that effectively rewrites section 101(22)(A) so that a "customer" qualifies as a "financial institution" only "when [the bank] is acting as agent . . . in connection with a securities *transfer*." Sp. App'x at 39 (emphasis added and alteration in original). Tellingly, section 101(22)(A) makes no mention of the word "transfer," and instead grants "financial[-]institution" status to a customer when a bank is acting as agent "in connection with a securities *contract*." 11 U.S.C. § 101(22)(A) (emphasis added). By substituting "transfer" for "contract," the majority impermissibly "alter[s], rather than . . . interpret[s], the [text of section 101(22)(A)]." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

Practically speaking, the majority's transfer-by-transfer approach renders section 101(22)(A)'s entire customer clause meaningless when read in conjunction with section 546(e), since it would cover no ground not already covered by the first enumerated-entities clause. Under the view espoused by the majority, the section 546(e) safe harbor only protects transfers that are made by a bank. It is evident, however, that sections 546(e) and 101(22)(A) contemplate that *some*

9

transfers "made by" the "customer" of a "bank" are also covered by the safe harbor. 11 U.S.C. §§ 546(e), 101(22)(A). After all, if section 546(e) covered only transfers "made by" a "financial institution" in the form of a "bank," what would be the point of section 101(22)(A)'s language specifying that a "financial institution" can *also* be "a customer" of a "bank" in certain circumstances? *Id.* The majority's reading – which would read the entire customer clause out of the statute – cannot be right. *See Reiter v. Sototone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute[,] we are obliged to give effect, if possible, to every word Congress used.").

What's more, even if we were to delve into "Congress's intent" in enacting section 546(e), the majority's arguments overlook the fact that Congress clearly balanced the goal of protecting creditors' rights through the trustees' avoidance powers against the competing goal of "minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Tribune*, 946 F.3d at 92 (internal quotation marks and alteration omitted). As this Court has recognized, the former "cannot . . . trump[]" the latter. *Id.* at 94. Indeed, we have acknowledged that "the legislative history's mention of bankrupt 'customers' or 'other participants' and . . . the broad statutory

10

language defining the transactions covered" "reflected [Congress's] larger purpose" in enacting the statute – namely, "to promote finality and certainty for investors, by limiting the circumstances . . . under which securities transactions could be unwound." *Id.* (internal quotation marks and alterations omitted). Against this legislative backdrop reflecting Congress's intended goal of "enhancing the efficiency of securities markets in order to reduce the cost of capital to the American economy," I see no reason to limit the reach of the section 546(e) safe harbor by ignoring section 101(22)(A)'s customer clause in its entirety. *Id.* at 92 (quoting Bankruptcy of Commodity and Securities Brokers: Hearings Before the Subcomm. on Monopolies and Commercial Law of the Comm. on the Judiciary, 47th Cong. 239 (1981)); *see also* H. R. Rep. No. 101-484, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224.

To be sure, the majority's narrow reading of section 101(22)(A) would be more plausible if Congress had expressed a limited intent to protect only "commodities and securities *firms* in the settlement of securities transactions or the execution of securities contracts." *Tribune*, 946 F.3d at 90–91 (emphasis added). But this Court has squarely rejected such an interpretation of section 546(e). *See id.* at 91–92 (explaining that the "broad language" of section 546(e) – *i.e.*, "limitations

11

on avoidance of transfers made by a 'customer' of a financial institution 'in connection with a securities contract'" – indicates that Congress "intended to protect the [securities] process or market" as a whole, "rather than [just] firms" (citation omitted)).

In actuality, the majority's analysis appears to be driven by policy concerns about how a textual reading of the statute might affect creditors, shareholders, and other bankruptcy stakeholders in future bankruptcies that occur in the wake of leveraged buyouts. *See* Maj. Op. at 27–30 & n.8. But the Supreme Court has warned, in this very context, that concerns over matters of policy cannot be used to justify "deviat[ions] from the plain meaning of the language used in [section] 546(e)." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 897 (2018).

At any rate, the majority fails to explain why unwinding securities payments made by corporate entities *themselves* introduces any less "systemic risk," Maj. Op. at 29–30, than the voiding of transfers made by firms or other market intermediaries. Each threatens the finality of securities transactions, thereby undermining confidence in the entire securities market. *See Tribune*, 946 F.3d at 92 ("The broad language used in [s]ection 546(e) protects *[securities] transactions rather than [just] firms*, reflecting a purpose of enhancing the efficiency

of securities *markets* in order to reduce the cost of capital to the American economy." (emphasis added)).  And there is no doubt that if companies, institutional investors, or large shareholders face financial instability because securities transactions are undone years after leveraged buyouts are consummated, this would pose significant "threat[s] [to] the financial system." Maj. Op. at 29–30.  Likewise, the majority opinion's cursory *ipse dixit* about a broad section 546(e) safe harbor "introduc[ing] *inefficienc[ies]*," *id.* at 37 (emphasis added), is accompanied by no reasoning as to how a textual reading of section 546(e) yields an outcome that is less pareto efficient than the majority's approach.  All told, the majority opinion's vague gestures at market effects cloak what are, in reality, nothing more than its subjective views of what is "reasonable." Maj. Op. at 28.  But it is not the prerogative of this Court to disturb the delicate balance struck by Congress between creditors' interests and those of shareholders based on what we perceive to be fair or reasonable.  *See Anderson v. Wilson*, 289 U.S. 20, 27 (1933) ("We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason.  We take the statute as we find it.").

**B.**

Having settled on the contract-by-contract approach to defining "financial institutions" under section 101(22)(A)'s customer clause, I would hold that the qualifying-participant prong under section 546(e) is satisfied for not only the DTC and Certificate Transfers, but also the Restricted Shares Transfers.

Like the majority, I have no trouble concluding that Wells Fargo was acting as Nine West's "agent" with regard to the DTC and Certificate Transfers. *See Tribune*, 946 F.3d at 77–79 (holding that depositary that received and made payments for tendered shares on company's behalf in connection with a leveraged buyout was an "agent" under section 101(22)(A)). There is no dispute that these transfers were made by Wells Fargo, which acted as Nine West's "agent" given the role it played in cancelling shares and making payments to shareholders. Specifically, the Merger Agreement provided that payments for cancelled shares would be effectuated by a "paying agent . . . pursuant to a paying agent agreement in customary form." J. App'x at 383. And in turn, the paying agent agreement designated Wells Fargo as the paying agent and empowered it to "act as [Nine West's] special agent for the purpose of distributing the Merger

14

Consideration," hold funds that Nine West deposited for the shareholder transfers, and ultimately cancel the company's common stock. *Id.* at 217, 218, 221.

Unlike the majority, I am convinced that the qualifying-participant prong is also satisfied for the Restricted Shares Transfers. Given Wells Fargo's role in effectuating the DTC and Certificate Transfers, Nine West meets the definition of a "financial institution" by virtue of its status as a "customer" of a "bank" that "is acting as agent" "in connection with a securities contract" – in this case, the Merger Agreement. Because Nine West meets the requirements of a qualifying participant, and because the transfers in question satisfy section 546(e)'s qualifying-transaction prong, there can be no doubt that the Restricted Shares Transfers are sheltered by the safe harbor.[4]

## IV.

For all of these reasons, I dissent from the majority's opinion to the extent that it permits the Trustees to claw back the Restricted Shares Transfers under the Merger Agreement as avoidable fraudulent conveyances. While I agree with the

---

[4] Given my view that the DTC, Certificate, and Restricted Shares Transfers are protected from the Trustees' avoidance powers under section 546(e), it follows that all state-law constructive and intentional fraudulent conveyance claims brought by creditors or noteholders (and thereby the Trustees representing these individuals) and all unjust-enrichment claims against the company's directors and officers must be preempted. *See Tribune*, 946 F.3d at 90–97.

15

majority that sections 546(e) and 101(22)(A) bar the Trustees from avoiding the payments made to shareholders via the DTC and Certificate Transfers, I cannot agree with the majority's interpretation of "financial institution" under section 101(22)(A), which improperly strips the Restricted Shares Transfers of section 546(e) immunity from the Trustees' avoidance powers. To my mind, Congress spoke with unmistakable clarity in fashioning the section 546(e) safe harbor, which applies to a customer of a bank when that bank is acting as agent "in connection with a securities contract." 11 U.S.C. §§ 546(e), 101(22)(A). Because the securities contract in this case – the Merger Agreement – makes clear that Wells Fargo was acting as Nine West's agent in connection with that contract, Nine West meets the definition of a "financial institution" under section 101(22)(A) and its payments for the Restricted Shares Transfers are properly subject to section 546(e)'s safe harbor. As a result, I would affirm the judgment of the district court in all respects.

16